IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| **KAELIN CRISS** § | |
| § | |
| § | CIVIL ACTION 6:22cv317-JCB-KNM |
| vs. § | |
| § | |
| § | |
| **COMMISSIONER OF SOCIAL** § | |
| **SECURITY** § | |
| § | |
| § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff initiated this lawsuit by filing a complaint seeking judicial review of the Commissioner's decision denying his application for Social Security benefits. The matter was referred to the undersigned for findings of fact, conclusions of law and recommendations for the disposition of the matter pursuant to 28 U.S.C. § 636(b)(1). Having considered Plaintiff's brief (ECF 15), the Commissioner's responsive brief (ECF 17) and Plaintiff's reply brief (ECF 18), the undersigned recommends that the Commissioner's final decision be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) with instructions for further consideration consistent with this opinion.

**PROCEDURAL HISTORY**

Plaintiff filed an application for disability benefits on January 24, 2020 and an application for supplemental security income on February 6, 2020, both alleging disability beginning on January 13, 2020. The applications were denied initially and again upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a hearing

on October 15, 2021 and entered an unfavorable decision on October 28, 2021. Plaintiff sought review from the Appeals Council. On April 26, 2022, the Appeals Council denied the request for review. As a result, the ALJ's decision became that of the Commissioner. After receiving an extension of time, Plaintiff filed this lawsuit on August 10, 2022, seeking judicial review of the Commissioner's decision.

## STANDARD

Title II of the Act provides for federal disability insurance benefits. Title XVI of the Act provides for supplemental security income for the disabled. The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1983); *Rivers v. Schweiker*, 684 F.2d 1144, 1146, n. 2 (5th Cir. 1982); *Strickland v. Harris*, 615 F.2d 1103, 1105 (5th Cir. 1980).

Judicial review of the denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (*per curiam*). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471,

475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather, conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d at 360 (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d at 295 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)). A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance—that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed. Appx. 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n. 4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). However, the Court must do more than "rubber stamp" the Administrative Law Judge's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings." *Cook*, 750 F.2d at 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner must utilize a five–step sequential process. *Villa*, 895 F.2d 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; see *Bowling*, 36 F.3d at 435 (citing *Harrell*, 862 F.2d at 475). Under the five–step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non–severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)–(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three, or an affirmative answer at Steps Four and Five, creates a presumption of disability.

*Id*.  To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of his insured status.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982).  The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot perform his past relevant work.  *Anderson v. Sullivan*, 887 F.2d 630, 632–33 (5th Cir. 1989) (*per curiam*).

The procedure for evaluating a mental impairment is set forth in 20 CFR §§ 404.1520a and 416.920a (the "special technique" for assessing mental impairments, supplementing the five-step sequential analysis).  First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work.  20 CFR §§ 404.1520a(b)(1), 416.920a(b)(1).  Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation.  20 CFR §§ 404.1520a(c)(2–4), 416.920a(c)(2–4).  Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment.  20 CFR §§ 404.1520a(d), 416.920a(d).  If the ALJ's assessment is "none" or "mild" in the first three areas of function and is "none" in the fourth area of function, the claimant's mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 CFR §§ 404.1520a(d)(1), 416.920a(d)(1).  Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing.  20 CFR §§ 404.1520a(d)(2), 416.920a(d)(2).  Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the claimant's mental impairment,

including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3)]." 20 CFR §§ 404.1520a(d)(3) and (e)(2), 416.920a(d)(3) and (e)(2).

## ALJ'S FINDINGS

The ALJ made the following findings in her October 28, 2021 decision:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2. The claimant has not engaged in substantial gainful activity since January 13, 2020, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.971 *et seq*.).

3. The claimant has the following severe impairments: major neurocognitive disorder due to traumatic brain injury; respiratory distress syndrome; fracture of the right clavicle, right first rib, sternum, odontoid process and transverse process of C7; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: occasional climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional balancing (as balance is defined in the SCO), stooping, kneeling, and crouching; no crawling; frequent reaching, handling, and fingering with the right upper extremity; the avoidance of unprotected heights, workplace hazards, and moving machinery; simple, routine tasks with 1–2 step instructions not at a production pace; occasional interactions with supervisors and co-workers; no interactions with the general public; and occasional changes to a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 5, 1990 and was 29 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 13, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## ADMINISTRATIVE RECORD

*Administrative Hearing*

Plaintiff testified at his hearing on October 15, 2021. Plaintiff testified that he was thirty-one years old on the date of his hearing and that he last worked on January 13, 2020. He later clarified that he attempted to return to his prior work at some point, but he was unable to perform his duties. Plaintiff stated that his prior jobs included work as a cook, a tire technician, a floor technician, and a shipping and receiving supervisor. Plaintiff explained that he stopped working due to injuries received in a car accident on January 13, 2020, including a brain injury, respiratory distress syndrome, and fracture of the right clavicle, right first rib, sternum, and odontoid process and transverse process of sixth and seventh vertebrae of the cervical spine.

Plaintiff testified that he relies on his wife to take care of his personal affairs due to his brain injury. Plaintiff described difficulty with completing tasks, short-term memory and anger. He stated that he requires supervision and help from his wife and his father for everyday tasks, such as cooking and taking care of his children, because he does not remember what to do or have enough stamina. Plaintiff estimated that he can stand for twenty minutes to an hour, sit for up to

one hour at a time before needing to move around, and write for approximately two minutes at a time. Plaintiff testified that he typically requires a nap in the middle of the day, and he has difficulty with balance on stairs, bending over and stooping. He stated that he has not driven since his car accident.

A vocational expert witness, Martin Rauer, also testified at the hearing. Mr. Rauer identified Plaintiff's past work to include: (1) pizza baker, DOT 313.381-014, SVP 5, medium; (2) press operator, DOT 556.682-014, SVP 5, heavy; (3) shipping receiving supervisor, DOT 222.137-030, SVP 6, light; and (4) tire technician or tire repairer, DOT 915.684-010, SVP 3, heavy (medium as described by Plaintiff). The ALJ presented Mr. Rauer a hypothetical individual of Plaintiff's age, education, and work experience who can work at the light exertional level, occasionally climb ramps and stairs, cannot climb ladders, ropes, and scaffolds, occasionally balance, occasionally stoop, kneel, and crouch, cannot crawl, frequently reach, handle, and finger with the right upper extremity, avoid unprotected heights, workplace hazards, and moving machinery, and is limited to simple, routine tasks with one to two-step instructions and not at a production pace, occasional interactions with supervisors and coworkers and none with the general public, and occasional changes to a routine work setting. Mr. Rauer testified that the hypothetical individual could not perform any of Plaintiff's past work. He identified the following jobs that would be available: (1) cafeteria attendant, DOT 311.677-010, SVP 2, light, with 64,400 jobs in the national economy; (2) laundry worker, DOT 589.685-038, SVP 2, light, with 35,300 jobs in the national economy; and (3) construction flagger, DOT 372.667-022, SVP 2, light, with 48,800 jobs in the national economy.

Concerning the cafeteria attendant job, Mr. Rauer explained that it is consistent with a limitation on interactions with the general public because while it includes proximity to the general

8

public, the job does not require interaction with the general public. If the hypothetical individual is off task at least 15% of the workday, Mr. Rauer stated that he would not be able to maintain competitive employment in an unskilled job. In addition, if the hypothetical is changed to only occasional reaching and fingering in the dominant arm, the laundry worker job would be eliminated. Mr. Rauer opined that none of the identified jobs would permit absences of more than one day per month, and possibly less for a marginal or problematic employee.

*Medical Evidence*

Plaintiff was admitted to the hospital on January 13, 2020 following a car accident and he was discharged on February 18, 2020. His admitting and discharge diagnoses included motor vehicle accident complicated by traumatic brain injury, traumatic and metabolic encephalopathy with odontoid nondisplaced oblique fracture, subluxation of C1-C2, left transverse process fracture C7, ultimately requiring PEG tube placement, tracheostomy, pulmonary fibrosis, anemia, gastritis, transaminitis, tachycardia, secondary to neurogenic etiology versus sepsis, sepsis secondary to pneumonia, treated with prolonged antibiotics, initially methicillin-susceptible Staphylococcus aureus, followed by trachea-related pneumonia with Pseudomonas, leukocytosis that resolved, anemia that improved, thrombocytosis, hypokalemia that was replaced, lactic acidosis that resolved, transaminitis, troponin elevation secondary to demand, hyperkalemia that resolved, debility, and delirium. The discharge summary provides the following summation of Plaintiff's hospital care from January 13, 2020 to his discharge on February 18, 2020:

> Mr. Criss is a 30-year old male with no prior significant medical history that was known, who was initially admitted on 1/13 after a motor vehicle accident where he was the unrestrained driver and was actually found on the passenger side. He was initially brought to the ER with progressive lethargy and unresponsiveness, and he underwent trauma scan, was intubated with suspicion for aspiration, was found to have an odontoid base fracture with possible subluxation of C1 and C2, which was not significant on MRI with possible transverse fracture of C7. He was intubated and maintained on antibiotics and evaluated by Neurosurgery, General Surgery, and

> Pulmonology/Critical Care for vent management. There was no indication for surgery at that time per Neurosurgery with a recommendation for cervical spine collar for 90 days. He was treated for hyperkalemia as well, started on tube feedings and ventilator support. He initially had a severe traumatic brain injury with decreased mental status. He was followed by Neurology who performed an EEG and MRI of the brain, which showed residual blood products. He was maintained on ventilator support and empiric antibiotics with vancomycin and Zosyn and initial cultures grew negative blood cultures; however, endotracheal tube grew MSSA for which he was treated for almost 3 weeks. He then had continued fevers and leukocytosis with recurrent negative blood cultures, so he was taken off the antibiotics. Then, he underwent tracheostomy and PEG tube placement due to the prolonged diminished mental status. He had repeat tracheal cultures that grew Pseudomonas and so was started on meropenem by Infectious Disease and finished another course of antibiotics. His mental status started to improve after several weeks in the hospital and he had actually attempted to pull his trach out twice which had to be placed back in to the stoma without difficulty. He had some episodes of delirium that were treated with p.r.n. Ativan and pain medications. He was following commands and worked with PT/OT and his insurance approved his stay at a neuro rehab center and he will go there eventually for rehabilitation. He will continue on tube feedings to eventually attempt to decannulate his tracheostomy and remove his PEG tube as tolerated. By the time of discharge, he had finished antibiotics and was off of trach collar and was otherwise doing well with plan for rehab.

Administrative Record, ECF 10-7, at *14–15 (Bates stamp pp. 442–443).

Following his inpatient hospital care, Plaintiff received inpatient rehabilitation at Baylor Scott & White Institute for Rehabilitation until March 19, 2020. Plaintiff's PICC line was removed on February 20, 2020 and his trach was decannulated on February 21, 2020. By discharge, Plaintiff's ambulation improved to performing gait independently without assistive device within his room and the halls. He exhibited improvement in dynamic balance, endurance, activity tolerance, strength, motor, planning/coordination, functional mobility, gait, transfers, grading during ambulation and navigating a busy environment, behavior management, impulsivity, initiation, task sequencing and task persistence. Some deficits in safety awareness and pathfinding remained, with improvement upon receiving extra time to think and using context clues. Only minimal cueing was required for initiation and task sequencing. Therapy at a transitional care

facility was recommended.  Plaintiff required ongoing moderate verbal cues for organization and sequencing with novel and higher-level tasks due to ongoing cognitive deficits.  Plaintiff also continued to experience difficulty with active and passive range of motion in the right shoulder due to periscapular muscle tension.  The speech therapy discharge note relates that Plaintiff struggled to manage his daily therapy schedule without cues, but within structured reasoning tasks, he demonstrated an ability to follow concrete instructions accurately without difficulty and initiated attempts to incorporate strategies for organization of complex information.  He continued to experience limitations in sequencing, organization, and abstract problem solving with complex tasks.

Plaintiff then received inpatient post-acute brain injury rehabilitation at NeuroRestorative from March 19, 2020 to April 9, 2020.  The discharge summary notes that Plaintiff progressed in his therapies and he was discharged home.  Plaintiff was weight bearing as tolerated and exhibited good sitting/standing posture.  Sensation and tone/spasticity were intact.  Plaintiff had mild impairments in right upper extremity coordination and he was able to tolerate exercises with no signs of fatigue.  Plaintiff reached independence in bed mobility, transfers and stairs.  His gait distance reached community distances. Plaintiff's balance scores were 26/28 and 51/56.  Upper and lower extremity joint flexion, extension and abduction were all within functional limits, with the exception of right shoulder flexion limited to 120 degrees, with bilateral 4/5 strength.  Continued occupational therapy was recommended to further improve fine motor skills, reaction speed, and activity tolerance and speech therapy to increase independence.  Supervision and assistance were recommended for his safety and wellbeing while adjusting to living at home and his psychologist noted that he would benefit from a structured daily schedule that includes regular

chores, hobbies, physical exercise, and opportunities to socialize with others. Plaintiff received home health therapy following his discharge.

A CT of Plaintiff's cervical spine on April 9, 2020 showed a small cortical defect in the right lateral odontoid process with an oblique radiolucency likely representing an old healed fracture. There was no atlantoaxial subluxation or epidural mass. Central disc protrusions were viewed at C4–C5 and C5–C6 causing minimal spinal stenosis.

Dr. Douglas Barron examined Plaintiff on May 1, 2020 to establish primary care. Plaintiff continued wearing a cervical collar pending healing of his odontoid fracture. His depression screening score was 0. Plaintiff reported upper and lower extremity weakness, memory loss, and sleep disturbance. On examination, his scar from PEG placement was well-healed, his gait and station were normal, and he exhibited 5/5 strength in upper and lower extremities, bilaterally, with normal muscle tone and coordination. Dr. Barron recommended continued care with neurosurgery and neurology. Plaintiff returned on June 12, 2020 and reported memory improvement, sleep improvement, reflux improvement, and that he started driving again. He also noted having some issues with his temper. Plaintiff had normal range of motion in his neck and musculoskeletal system with normal gait and station and 5/5 strength in the upper and lower extremities, bilaterally.

At a return visit with Dr. Barron on October 8, 2020, Plaintiff reported rib pain on his left side, lasting for five months since the PEG tube was placed, and pain when yawning, lasting for two months. Plaintiff stated that he could not work because of memory limitations and an inability to carry out tasks. Dr. Barron noted speech changes and memory loss. Normal gait and station, coordination, and strength remained. Dr. Barron discussed medication options for attention and concentration, referred Plaintiff for speech therapy, noted that Plaintiff's agitation was stable and slowly improving, and prescribed cyclobenzaprine for rib pain.

Plaintiff returned for chronic medication follow up on May 11, 2021. Dr. Barron noted normal mood and affect, behavior, and judgment and thought content, with impaired cognition and memory. Dr. Barron provided education concerning a heart healthy diet and referred Plaintiff to an ENT to evaluate ear issues.

Plaintiff had a consultative psychological evaluation on March 3, 2020. Plaintiff's evaluation is set out in a report signed by Cortney Barton, M.A., LPC-Intern, and Sarah M. Kranz, Ph.D., Licensed Psychologist, on August 4, 2020. Plaintiff and his wife both reported that Plaintiff's ability to complete tasks is poor and he needs supervision due to his cognitive issues. He was cooperative, but unable to answer all questions asked. Plaintiff provided goal-directed responses in a normal response time, but his abstract thinking appeared somewhat limited. Plaintiff exhibited relevant and logical thought content with no hallucinations or delusions. Plaintiff described his mood as "good" and denied sleep difficulties, but his wife indicated that he sleeps off and on throughout the day. Plaintiff was oriented but had a somewhat limited fund of general information. Recent memory was mildly impaired and remote memory was intact. Concentration and attention were similarly mildly impaired. Plaintiff demonstrated knowledge of good judgment. Plaintiff's ability to complete tasks in a timely and appropriate manner over a sustained period of time was rated as poor. Plaintiff reported the ability to groom and dress himself and prepare simple meals, but he stated that he requires supervision while bathing, cannot purchase food or other necessities, cannot use the oven or stove without supervision, and has been instructed by his doctor not to drive.

Plaintiff completed the Wechsler Adult Intelligence Scale-Fourth Edition for intellectual assessment. His Verbal Comprehension Index was in the low average range, his Perceptual Reasoning Index and Working Memory Index were in the average range, and his Processing Speed

Index was in the borderline range. Plaintiff's full-scale IQ score of 77 indicates functioning in the borderline range of intellectual ability and his general abilities index score of 80 is in the low average range. Plaintiff Wide Range Achievement Test-IV and WRAT5 were consistent with his IQ. Plaintiff's Auditory Memory Index and Delayed Memory Index were in the extremely low range and his Visual Memory Index and Immediate Memory Index were in the borderline range. The Trail Making Test showed some difficulty with executive functioning.

The report diagnoses major neurocognitive disorder due to traumatic brain injury with a prognosis of guarded to poor. The report opines that Plaintiff would likely have difficulty remembering information in a work setting, understanding and applying information in a work setting, and learning and using information to perform work duties, but he appears capable of carrying out simple tasks and simple one or two-step instructions. It states he would be likely to have difficulty relating appropriately to supervisors, co-workers, and the public, concentrating and focusing his attention on work-related tasks, and adapting and managing his own emotions. His ability to maintain well-being in a work setting is guarded due to emotion concerns, including difficulty controlling his behavior, and he has exhibited a poor ability to cope with stress at work or at home.

Dr. Paul Patrick completed a consultative neurology examination on August 19, 2020. On examination, Plaintiff exhibited tenderness to palpation in the cervical midline area. He had a slightly antalgic gait and he could perform heel and toe walking and tandem walking, but squatting and hopping was limited and painful. Cranial nerves were intact, Plaintiff was oriented and he scored 30/30 on a mini mental examination. Deep tendon reflexes were +2 bilateral and symmetrical, pinwheel was intact, and Plaintiff was able to perform finger-to-nose testing. Dr. Patrick opined that Plaintiff is limited to sitting for a moderate period of time of one to two hours,

standing for a short period of twenty to thirty minutes, walking a short distance of one block and lifting five pounds.

A State agency consultant, Joel Forgus, Ph.D., reviewed the record and assessed Plaintiff's mental residual functional capacity on August 28, 2020. Dr. Forgus opined that the record supports moderate limitations in Plaintiff's ability to remember locations and work-like procedures, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting; and marked limitations in the ability to understand, remember, and carry out detailed instructions. Dr. Forgus determined that the record does not support significant limitations in the ability to understand, remember, and carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. On reconsideration, Susan Daughterty, Ph.D., agreed with Dr. Forgus's assessment.

Another State agency consultant, Dr. Leigh McCrary, reviewed the record and assessed Plaintiff's physical residual function capacity on August 27, 2020. Dr. McCrary opined that

Plaintiff retains the ability to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and pull within lift and carry restrictions, with occasional climbing ramps, stairs, ladders, ropes, and scaffolds, balancing, stooping, kneeling, crouching, and crawling. On reconsideration, Dr. Scott Spoor added manipulative limitations on reaching on the right, such that Plaintiff can occasionally lift and reach overhead and frequently lift and reach forward.

## DISCUSSION AND ANALYSIS

In his brief, Plaintiff raises two issues for review: (1) whether the ALJ's finding is based upon a deficient evaluation of his treatment history; and (2) whether the ALJ performed a deficient analysis of the persuasiveness of Dr. Kranz's medical opinion. Plaintiff complains that the ALJ stated that the treatment for his conditions has been conservative and limited in nature after the initial traumatic injury. Plaintiff recites the extensive care he received following his car accident, including multiple rehabilitative stays. Plaintiff submits that the ALJ ignored evidence concerning his brain rehabilitation treatment, that was cut short due to COVID-19 concerns, and instead relied on later physical examinations. Plaintiff also asserts that the ALJ inappropriately relied on a mini mental status examination by Dr. Patrick, who is not a neurologist, to contradict Dr. Kranz's psychological evaluation. When considering Dr. Kranz's opinion, Plaintiff argues that the ALJ inappropriately determined that her opinion was not persuasive without fully considering the applicable objective evidence.

In response, the Commissioner succinctly asserts that the ALJ properly considered medical records from the accident, including rehabilitation, and accurately summarized the treatment history. The Commissioner contends that the ALJ properly found Dr. Kranz's opinion not persuasive because it was not consistent with her own examination or other record evidence.

Plaintiff submitted a reply brief re-asserting that the ALJ did not adequately consider the medical evidence related to initial treatment and rehabilitation following the car accident. In addition, Plaintiff argues that the ALJ only pointed to evidence that did not support Dr. Kranz's opinion and ignored the findings in support of her conclusions.

As noted by Plaintiff, the ALJ's decision shows a cursory review of the medical record. The ALJ did not discuss the medical evidence at all with regard to the identification of severe impairments. In the residual functional capacity ("RFC") analysis, the only references to medical evidence of his physical condition from treating sources include:

> The claimant's allegations are not supported by physical examination. The claimant has not been using an assistive device since June of 2020. (8F/83). He has received little to no treatment for physical impairment in over a year, and his last examination showed intact physical function: intact range of motion, normal gait, full strength, normal coordination, and normal respirations. (8F/52).
> . . .
> The claimant's treatment for his conditions has been conservative and limited in nature since the initial traumatic injury. The claimant was in a motor vehicle accident on January 13, 2020, where he suffered a traumatic brain injury and several fractures. (2F; 3F; 4F; 5F). He was hospitalized until February 18, 2020, and then sent to inpatient rehabilitation. (2F; 3F; 4F; 5F). He was discharged from inpatient rehabilitation on April 10, 2020. (2F; 3F; 4F; 5F). There is some evidence of outpatient occupational and physical therapy in April 2020. (5F). However, thereafter, the claimant's treatment has been limited to visits with his primary care physician. (8F). In regard to his cognitive impairment, the claimant follows with his primary care physician and he has not seen a neurologist or brain clinic. (8F). The claimant has not received treatment for physical impairment in over a year. (8F).

Administrative Record, ECF 10-2, at *39 (Bates stamp p. 38). This recitation does not provide sufficient insight into the ALJ's reasoning or the full body of medical evidence that was considered. "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citations omitted).

17

The ALJ provided a similarly cursory review of Dr. Kranz's consultative opinion. The 15-page report from Dr. Kranz includes extensive notes concerning Plaintiff's subjective statements, the mental status examination, adaptive living skills, cognitive functioning testing, academic achievement testing, neurocognitive functioning testing, ability-memory analysis, and diagnostic impressions. The ALJ provided a short explanation for determining that the opinion is not persuasive:

> The full extent of the opinion is not supported by this physician's own mental status examination of the claimant. At the psychological consultative examination, the claimant scored a full scale IQ of 77 falling in the borderline range of intellectual ability (notable memory impairment on testing). (6F). However, mental status examination revealed only mildly impaired concentrations, mildly impaired recent memory (normal immediate and remote memory), and a somewhat limited fund of knowledge (6F). Further, the opinion is not consistent with the nature of the claimant's treatment. The claimant follows with his primary care physician and has not seen a neurologist or brain clinic. (8F).

Administrative Record, ECF 10-2, at *41 (Bates stamp p. 40).

The revised rules for the consideration and articulation of medical opinions apply to claims filed after March 27, 2017. 20 C.F.R. § 404.1520c. Plaintiff filed his first application on January 24, 2020. Pursuant to 20 C.F.R. § 404.1520c(a), the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."

The ALJ evaluates the persuasiveness of the medical opinions and articulates the consideration of medical opinions, but the ALJ is not required to explain the consideration of each factor that is considered. 20 C.F.R. § 404.1520c(b). The "supportability" and "consistency" factors are most important. *Id.* Concerning "supportability," the regulation provides "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion or prior administrative medical finding, the more

18

persuasive the medical opinion or prior administrative medical finding will be." 20 C.F.R. § 404.1520c(c)(1). Similarly, "[t]he more consistent a medical opinion or prior administrative medical finding is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion or prior administrative medical finding will be." 20 C.F.R. § 404.1520c(c)(2).

Here, the ALJ does not adequately address the supportability and consistency of Dr. Kranz's opinion. She provides a very limited review of the opinion without showing thoughtful consideration of all of the objective findings in the examination or adequately describing how it is inconsistent with the record as a whole. The ALJ erred by failing to properly consider this medical opinion in accordance with 20 C.F.R. § 404.1520c.

For the reasons above, the ALJ's decision is not supported by substantial evidence. As a result, the decision of the ALJ denying benefits must be reversed. *See Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000). The identified errors require a remand.

## RECOMMENDATION

It is hereby **RECOMMENDED** that the Commissioner's final decision be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) with instructions for further consideration consistent with the findings above.

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b).

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after service shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations

and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Assn.*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 14th day of February, 2024.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE